**GILBERT & CADDY, P.A., Plaintiff,**

**v.**

**JP MORGAN CHASE BANK, N.A.,**
**and John Does, Defendants.**

Case No. 15-cv-60653-BLOOM/Valle

United States District Court,
S.D. Florida.

Signed 06/15/2016

Alan Keith Marcus, Alan K. Marcus PA, Coral Gables, FL, for Plaintiff.

Daniel Matthias Coyle, Gregory Stewart Grossman, Astigarraga Davis Mullins & Grossman, PA, Miami, FL, for Defendants.

## ORDER ON MOTION FOR SUMMARY JUDGMENT

BETH BLOOM, UNITED STATES DISTRICT JUDGE

**THIS CAUSE** is before the Court upon Defendant JP Morgan Chase Bank, N.A.'s ("Chase") Motion for Summary Judgment, ECF No. [115] (the "Motion"), requesting that the Court grant summary judgment in favor of Chase on all claims. The Court has carefully reviewed the Motion, the record, all supporting and opposing filings, the exhibits attached thereto, and is otherwise fully advised. For the reasons that follow, the Court grants in part and denies

in part the Motion for Summary Judgment.

## I. BACKGROUND

On or about January 24, 2009, Randall Gilbert, Esquire, and his brother, Bryce Gilbert, Esquire (collectively, the "Gilberts"), opened an IOTA trust account (the "IOTA Trust Account") and operating account (collectively, the "Accounts") for their law firm, Gilbert & Caddy, P.A. ("Plaintiff") with Washington Mutual. *See* ECF No. [49] ¶ 6 (Amended Complaint). The Gilberts were the only authorized signatories to the Accounts. *See* ECF No. [126-8] ¶ (4)(k) (Affidavit of Randall Gilbert). In July 2009, after Washington Mutual had merged with Chase, Chase and Plaintiff executed a Deposit Account Agreement (the "2009 Agreement"). *See* ECF Nos. [116] ¶ 10 (Chase's Statement of Undisputed Facts); [126] ¶ 10 (Plaintiff's Statement of Controverted Facts). Plaintiff claims it "refused repeated overtures" from Chase to open an online wire service, and never acquiesced or authorized online access to its bank accounts. ECF No. [126-8] ¶ (4)(e), (o); *see also id.* ¶ (4)(r)-(s), (x). The parties executed an updated Deposit Account Agreement on February 1, 2012 (the "2012 Agreement"). *See* ECF Nos. [116] ¶ 10; [126] ¶ 10.

Meanwhile, sometime between early January 2010 and early 2011, Plaintiff's employee Steven Sacks ("Sacks") began transferring funds via wire and/or electronic transfers to accounts unaffiliated with Plaintiff (the "Sacks Transfers" or "Transfers"). *See* ECF Nos. [116] ¶ 4; [126] ¶ 4. Many of the transfers went to a Chase bank account for a Nevada limited liability company called "S Qwerty." *See id.* Chase sent bank statements (collectively, the "Account Statements" or "Statements") to Plaintiff by mail on a monthly basis "which showed all of the transfers to S Qwerty and/or Steven Sacks," up to and including an Account Statement for De-cember 2013, mailed by Chase to Plaintiff on or before January 9, 2014. *See* ECF Nos. [116] ¶¶ 22, 24, 26; [126] ¶¶ 22, 24, 26. Plaintiff received the Statements but did not notify Chase of any errors until 61 days later on March 11, 2014. *See* ECF Nos. [116] ¶¶ 22, 27; [126] ¶¶ 22, 27. By then, Sacks had transferred between $3,846,800 and $4,586,390 to accounts inside and outside Chase. *See* ECF Nos. [116] ¶ 4; [126] ¶ 4. Sacks was arrested on December 3, 2014, and charged with four counts of wire fraud in the case *United States v. Sacks*, No. 14-60290-CR-COHN. *See* ECF No. [49] ¶ 32-33. Sacks pled guilty to one count, and on February 27, 2015, a federal court sentenced Sacks to serve a term of seven years and three months in federal prison. *See id.* at ¶ 33.

Plaintiff initially filed the instant action in the Seventeenth Judicial Circuit in and for Broward County, Florida, asserting claims against Chase for negligence, aiding and abetting fraud, aiding and abetting breach of fiduciary duty, aiding and abetting conversion, and civil conspiracy to commit fraud. *See* ECF No. [1] ¶¶ 44-94. On March 30, 2015, Chase removed the matter to this Court pursuant to 28 U.S.C. §§ 1441(a) and 1332(a). *See id.* ¶ 8. Chase filed a Motion to Dismiss, ECF No. [19], on May 22, 2015, which the Court granted in part and denied in part on August 19, 2015. *See* ECF No. [45]. Plaintiff thereafter filed an Amended Complaint, ECF No. [49], asserting claims for negligence (Count I) and breach of contract (Count II) related to Sacks' theft of funds from the Accounts. Following discovery by the parties, Chase filed the instant Motion for Summary Judgment contending that Plaintiff's claims are barred on three separate grounds: Plaintiff's lack of timely notice pursuant to the deposit account agreements, a lack of standing to recover funds from the IOTA account and a damage waiver contained in the account agree-

ments. Nearly two months after the filing of Defendant's Motion, Plaintiff now seeks leave to File Second Amended Complaint, ECF No. [124]. The Court addresses each Motion in turn.

## II. LEGAL STANDARD

A court may grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The parties may support their positions by citation to the record, including, *inter alia*, depositions, documents, affidavits, or declarations. *See* Fed. R. Civ. P. 56(c). An issue is genuine if "a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir.2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* (quoting *Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505). The Court views the facts in the light most favorable to the non-moving party and draws all reasonable inferences in the party's favor. *See Davis v. Williams*, 451 F.3d 759, 763 (11th Cir.2006). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which a jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. The Court does not weigh conflicting evidence. *See Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1140 (11th Cir.2007) (quoting *Carlin Comm'n, Inc. v. S. Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir.1986)).

The moving party shoulders the initial burden to demonstrate the absence of a genuine issue of material fact. *See Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008). If a movant satisfies this burden,

"the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Ray v. Equifax Info. Servs., L.L.C.*, 327 Fed. Appx. 819, 825 (11th Cir.2009) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). Instead, "the non-moving party 'must make a sufficient showing on each essential element of the case for which he has the burden of proof.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). The non-moving party must produce evidence, going beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designating specific facts to suggest that a reasonable jury could find in the non-moving party's favor. *Shiver*, 549 F.3d at 1343. But even where an opposing party neglects to submit any alleged material facts in controversy, the court cannot grant summary judgment unless it is satisfied that all of the evidence on the record supports the uncontroverted material facts that the movant has proposed. *See Reese v. Herbert*, 527 F.3d 1253, 1268–69, 1272 (11th Cir.2008); *United States v. One Piece of Real Prop. Located at 5800 S.W. 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1103 n. 6 (11th Cir.2004).

## III. DISCUSSION

Chase moves for summary judgment in its favor pursuant to Fed. Civ. P. 56, and makes three primary arguments. First, Chase argues that Plaintiff cannot recover the amounts transferred from the Accounts prior to January 1, 2014 because Plaintiff did not comply with the 30-day notification provision contained in the Agreements. *See* ECF No. [115] at 2. According to Chase, the Agreements require Plaintiff to notify Chase of any unauthorized transfers within 30 days of Chase

mailing the account statements on which the unauthorized transactions appeared. *See id.* Because Plaintiff did not notify Chase of the transfers until March 11, 2014, Chase argues that the majority of Plaintiff's claims are barred. *See id.* Next, Chase contends that Plaintiff lacks standing to recover any of the transfers made from Plaintiff's IOTA Trust Account, encompassing all but $30,000 in dispute. *See id.* Finally, Chase contends that the damages waiver provisions of the Agreements bar Plaintiff's claims for incidental damages, consequential damages, loss of goodwill, and loss of reputation. *See id.* at 3.

Plaintiff retorts that material facts remain in dispute. *See* ECF No. [125] at 16. Specifically, Plaintiff argues that the Gilberts never agreed to any online services, and thus, the 2009 and 2012 Agreements do not cover the Sacks Transfers. *See id.* at 4. Plaintiff further argues that even if the Agreements govern, the 30-day notification condition precedent to filing suit does not apply to the transfers at issue. *See id.* at 6. In the alternative, Plaintiff argues that the 30-day notification provision constitutes an impermissible modification and expansion of section 674.406 of the Florida Statutes ("§ 674.406"), and that regardless, Chase's material breach of the Agreements excused Plaintiff from complying with the provision. *See id.* at 6, 11. Plaintiff contends that it has standing to bring claims based on transfers from the IOTA Trust Account as the owner of that account and trustee of the monies contained therein, and because it has reimbursed clients and it has also been sued for reimbursement by its insurance company. *See id.* at 14. Finally, Plaintiff asserts that the Motion is premature because discovery delays have prevented the taking of "crucial depositions." *See id.* at 17. The Court addresses the Motion, and Plaintiff's concerns, in full.

## A. Standing

■ The vast majority of the Sacks Transfers originated in Plaintiff's IOTA Trust Account. *See* ECF Nos. [116] ¶¶ 4-5; [126] ¶ 5. Chase argues that Plaintiff lacks standing to bring claims related to this account. As the issue potentially divests this Court of jurisdiction to adjudicate many of Plaintiff's claims, the Court first addresses Plaintiff's standing to bring this suit. *See O'Halloran v. First Union Nat. Bank of Florida,* 350 F.3d 1197, 1202 (11th Cir.2003).

■ "Whether a party has a sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy is what has traditionally been referred to as the question of standing to sue." *Sierra Club v. Morton,* 405 U.S. 727, 731–32, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). "Where the party does not rely on any specific statute authorizing invocation of the judicial process, the question of standing depends upon whether the party has alleged such a personal stake in the outcome of the controversy." *Id.* at 732, 92 S.Ct. 1361 (internal quotations omitted); *see AT&T Mobility, LLC v. Nat'l Ass'n for Stock Car Auto Racing, Inc.,* 494 F.3d 1356, 1360 (11th Cir.2007). To possess standing, a plaintiff must show (1) that it personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant; (2) that the injury fairly can be traced to the challenged action; and (3) that the injury is likely to be redressed by a favorable decision in the suit." *See Lujan v. Defs. of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *see also Nat'l Council On Comp. Ins., Inc. v. Am. Int'l Grp., Inc.,* 2009 WL 2588902, at *2 (N.D.Ill. Aug. 20, 2009). A court should not "speculate concerning the existence of standing, nor ... imagine or piece together an injury sufficient to give plaintiff

standing when it has demonstrated none." *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 976 (11th Cir.2005) (internal quotations omitted). "The plaintiff has the burden to clearly and specifically set forth facts sufficient to satisfy Art. III standing requirements." *Id.* (internal quotations and alternations omitted).

■ An IOTA account is "an interest or dividend-bearing trust account benefiting The Florida Bar Foundation." Fla. Bar R. 5–1.1(g)(1)(C). Like many IOTA accounts, Plaintiff's IOTA Trust Account contained monies related to property closings or funds held for Plaintiff's litigation clients in trust. *See* ECF Nos. [116] ¶ 11; [126] ¶ 11. To the extent that the IOTA Trust Account contained client funds, Plaintiff served as a trustee over those funds. *See A Petition of Florida Bar*, 356 So.2d 799, 800–01 (Fla.1978); *see also Cone v. State Bar of Florida*, 819 F.2d 1002, 1006 (11th Cir.1987); Fla. Bar R. 5–1.1 (Comment) ("A lawyer must hold property of others with the care required of a professional fiduciary ... clearly labeled as a trust account and in which only client or third party trust funds are held."). The Supreme Court has long held "that trustees of an express trust are entitled to bring diversity actions in their own names and upon the basis of their own citizenship." *Navarro Sav. Ass'n v. Lee*, 446 U.S. 458, 462, 100 S.Ct. 1779, 64 L.Ed.2d 425 (1980) (citing *Chappedelaine v. Dechenaux*, 8 U.S. 4 Cranch 306, 308, 2 L.Ed. 629 (1808)); *see* Fed. R. Civ. P. 17(a) (Providing that such trustees are real parties in interest for procedural purposes). For this very reason, " 'the residence of those who may have the equitable interest' is simply irrelevant" in diversity actions. *Navarro Sav. Ass'n*, 446 U.S. at 462, 100 S.Ct. 1779 (quoting *Bonnafee v. Williams*, 3 How. 574, 577, 44 U.S. 574, 11 L.Ed. 732 (1845)). Accordingly, an injury to trust property affords "[t]rustees [with] Article III standing to assert claims arising out of damage

to trust property." *Nat'l Council on Compensation Ins., Inc.*, 2009 WL 2588902, at *5 (citing *Navarro Sav. Ass'n*, 446 U.S. at 462, 100 S.Ct. 1779). Because Plaintiff served as trustee over the IOTA Trust Account and that trust allegedly suffered an injury, Plaintiff has standing to bring suit to recover damages incurred by the trust. *See Lujan*, 504 U.S. at 560–61, 112 S.Ct. 2130; *Navarro Sav. Ass'n*, 446 U.S. at 462, 100 S.Ct. 1779.

The bankruptcy and subrogation cases relied upon by Chase do not sway the Court, as the concepts of standing analyzed therein are predicated on a relationship distinct from the one at issue. *See In re Whitley*, 2013 WL 486782, at *1 (Bankr. M.D.N.C. Feb. 7, 2013) (citing *Caplin v. Marine Midland Grace Trust Co. of New York*, 406 U.S. 416, 434, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972) (Finding that a particular trustee does not have standing under Chapter X of the Bankruptcy Act based on Congress's intent in regulating bankruptcy)); *Brewer Envtl. Indus., LLC v. Matson Terminals, Inc.*, 2011 WL 1637323 (D.Haw. Apr. 28, 2011) (Asset-purchaser subrogation). For instance, in *Brewer*, the court found that the plaintiff lacked standing under *Lujan* because the alleged injury consisted of merely "unreimbursed payment of compensation, benefits, attorneys' fees, and costs stemming from [a nonparty] trauma claim." *Brewer Envtl. Indus., LLC*, 2011 WL 1637323, at *6. Here, Plaintiff alleges a concrete injury to the trust for theft of trust funds, stolen from a trust over which Plaintiff served as trustee and had a fiduciary duty by law. *See* Fla. Bar R. 5–1.1; *see also White Mountain Apache Tribe v. United States*, 249 F.3d 1364, 1379 (Fed.Cir.2001), *aff'd and remanded*, 537 U.S. 465, 123 S.Ct. 1126, 155 L.Ed.2d 40 (2003) ("Indeed, under the common law of trusts, '[t]he first duty of a trustee must be to preserve the trust property intact. To do this, he must not suffer

the estate to waste or diminish ....' ") (internal quotations omitted)). Naturally, the alleged injury to the IOTA Trust Account traces directly to the Sacks Transfers, and can be redressed by a favorable decision in this suit. *See Lujan,* 504 U.S. at 560–61, 112 S.Ct. 2130. Plaintiff, therefore, may sue to remedy the injury suffered by the trust. *See Nat'l Council on Compensation Ins., Inc.,* 2009 WL 2588902, at *5. The Court finds that Plaintiff has Article III standing for all asserted claims, including its claims related to the Sacks Transfers originating in its IOTA Trust Account.

### B. The 2009 and 2012 Agreements' Notification Provision

*1. The Agreements' notification provision applies to the Sacks Transfers*

■ Jurisdiction satisfied, the Court addresses the contract dispute at issue. Chase asserts that Plaintiff cannot bring many of its claims because Plaintiff did not notify Chase of the unauthorized Sacks Transfers until March 11, 2014, well beyond the 30-day notice requirement delineated in the 2009 and 2012 Agreements (collectively, the "Agreements"). Plaintiff does not dispute that both a 2009 and 2012 Agreement exist, but argues that the 30-day notification provision included therein does not apply to the Sacks Transfers. *See* ECF No. [126] ¶¶ 10, 15, 19-21. The Court disagrees.

The 2009 Agreement reads, under the section " Notification of Errors, Forgeries and Unauthorized Signatures":

You agree to reconcile your statement promptly upon receipt. If we honor a check or other item drawn on or posted to your Account that is altered in any way or was not drawn or otherwise authorized by you ("unauthorized item") or if your Account statement contains any errors, you agree to notify us in writing of such unauthorized item or error within 30 days of the date on which the

unauthorized item, or the Account statement that contained a description of the unauthorized item or error, was mailed, transmitted or otherwise made available to you. ... Failure to report an unauthorized item or error, or that you did not receive your scheduled statement, within the 30-day time frame set forth above, or to abide by the conditions set forth herein, shall be deemed conclusive proof that you failed to exercise reasonable care and promptness in examining the items and statements of the affected Account and in notifying us of the unauthorized item or error. You agree that such items and errors shall therefore be fully enforceable against you and you shall have no claim against us for same and shall be barred from bringing any action against us that is in any way related to the unauthorized item or errors.

Notwithstanding the foregoing, the Electronic Funds Transfer Services section of this Agreement governs the reporting of errors on consumer electronic funds transfers governed by Federal Reserve Board Regulation E. You also have those rights afforded to you under federal law for substitute checks. Please see the Check 21 section of this Agreement for more information.

ECF No. [116-2] at 208; *see* ECF No. [125] at 4-5. Similarly, the 2012 Agreement states, under the section "Notice of errors, forgeries and unauthorized signatures":

You must notify us in writing within 30 days after we mail a statement or otherwise make a statement available (for example, paperless statements) if:

● An item that you did not authorize or that is altered is listed on the statement;

● Your account statement contains any errors; or

• You did not receive your scheduled statement. . . .

If you do not comply with the requirements above, we are not required to reimburse you for any claimed loss, and you cannot bring any legal claim against us in any way related to the item or errors. However, the Electronic Funds Transfer Services Terms section of this agreement applies to the reporting of errors on personal electronic funds transfers subject to Federal Reserve Board Regulation E. You also have certain rights under federal law for substitute checks; please see the Substitute Checks and Your Rights section of this agreement for more information.

ECF No. [116-2] at 255; *see* ECF No. [125] at 5. The 2012 Agreement further defines "item" broadly to mean "any check, ACH, funds transfer, teller cash withdrawal, ATM withdrawal, debit card purchase, fee, charge, or other amount that is added to or subtracted from your account." ECF No. [116-2] at 243.

The parties agree that Sacks made the transfers through wire and electronic means and that Plaintiff did not notify Chase until March 11, 2014. Plaintiff argues, however, that the Electronic Funds Transfer Services Terms ("EFTS") referenced within the Agreements' notification provision, and not the 30-day notice requirement, governs the Transfers. Although the provisions above do reference the EFTS portion of the Agreements, the provisions make clear that the EFTS only applies to *"consumer* electronic funds transfers" (2009) and *"personal* electronic funds transfers" (2012). ECF No. [116-2] at 208, 255 (emphasis added). Tellingly, Plaintiff does not assert that the Sacks Transfers qualify as "consumer" or "personal" transfers and, under

the Agreements, the Accounts are clearly for business purposes. The 2009 Agreement defines "Business Accounts" as one "[w]here a corporation, unincorporated association or limited liability company, partnership, including a limited partnership, limited liability partnership, or joint venture, government entity or sole proprietor . . . is designated or appears on a signature card as the owner of such account." ECF No. [116-2] at 211. Similarly, the 2012 Agreement states that "[i]f your account is a type listed under 'Personal Accounts' in our product information, you agree not to use it for business purposes."[1] *Id.* at 256. The Account Statements themselves show that the Sacks Transfers all originated from Plaintiff's business accounts, and therefore constitute neither consumer nor personal transfers. *See* ECF Nos. [116-1] at 146 (referring to the 4288 Account as "IOLTA Account"); *id.* at 1 (referring to the 0745 Account as "Chase BusinessPlus Extra"). Because the EFTS referral does not apply to the Sacks Transfers, the Transfers constitute "unauthorized items" or "errors" under the Agreements subject to the 30-day notification provision. Plaintiff had a duty to alert Chase of any "unauthorized item" or "error" appearing on its Account Statements within 30 days of its mailing, and Plaintiff failed to do so until March 11, 2014. Accordingly, the majority of Plaintiff's claims are barred by the express terms of the Agreements.

Moreover, even if the EFTS portion of the Agreements somehow applied to the Sacks Transfers, Plaintiff's argument would still fail. Plaintiff claims that the EFTS contains an alternate and superseding notification provision, pointing to a phrase in the EFTS providing that "[a]dditional disclosures and specific terms and

---

**1.** The Court notes that the Electronic Fund Transfer Act of 1978 defines "consumer" as a "natural person" and "consumer accounts" as accounts "established primarily for personal, family, or household purposes." 15 U.S.C. § 1693a(2), (6).

conditions for using the online services will be provided when you enroll." ECF No. [116-2] at 220. That sentence, however, is not expressed in isolation, but rather, is found under subsection (C) of the EFTS entitled "Online Bill Payment and Transfer Services." Subsection (C) applies when a client "use[s] the Internet to electronically direct [Chase] to make payments from your checking account to third parties ('payees') whom you have selected in advance to receive payment by means of the online bill payment service." *Id.* Plaintiff does not allege that it or Sacks utilized Chase's "online bill payment service," rendering subsection (C) inapplicable. Rather, the applicable provision within the EFTS appears at page 38 of the 2009 Agreement, providing that for business accounts like Plaintiff's, "liability for unauthorized transactions, *including electronic funds transfers*, shall be governed by Section II of this Agreement, entitled 'Deposit Account Agreement.'" *Id.* at 221 (emphasis added). Pertinently, the "Deposit Account Agreement" includes the very "Notification of Errors" subsection and 30-day notice provision that Plaintiff seeks to avoid. *See id.* at 208. This logically follows as both the 2009 and 2012 Agreements provide that the EFTS applies only to "consumer" or "personal" electronic funds transfers. *Id.* at 208, 255. To remove any doubt, the 2012 Agreement makes clear that "all of the provisions of the Deposit Account Agreement, including liability limitations and requirements that you give us prompt notice of unauthorized items, apply to your EFT [Electronic Funds Transfer] services." *Id.* at 274.

■ Plaintiff further argues, seemingly in the alternative, that neither the Agreements nor the EFTS portions apply, but rather, that an "Online Service Agree-

ment" ("OSA") and "Wire Transfer Services Addendum to Online Service Agreement" ("WTSA") govern Chase's liability. *See* ECF No. [125] at 6. The Court rejects this claim as Plaintiff simultaneously contends "that it never agreed to any online services, nor executed any such agreements." *Id.* If Plaintiff did not agree to the WTSA or OSA, those addendums cannot control or otherwise alter the express terms of the 2009 and 2012 Agreements. Moreover, the WTSA simply "ratifie[s], affirm[s] and incorporate[s] ... the terms of the Initial Agreement," which "shall continue to apply in all respects, as amended hereby." ECF No. [126-2] at 33 (WTSA ¶ 1); *see id.* at 5 (¶ 9 OSA). Although inapplicable to the dispute at issue, Plaintiff relies on paragraph 10 of the WTSA which states, in pertinent part, that Chase

> Shall not be liable for (1) any errors or losses you sustain using the WTS except where we fail to exercise ordinary care in processing any transaction ... Our liability in any case shall be limited to the amount of any funds improperly transferred from your Wire From account less any amount that, even with the exercise of ordinary care, would have been lost.

*Id.* at 37 (WTSA ¶ 10). Paragraph 10, then, simply provides an additional limitation on Chase's liability for errors or losses sustained using wire transfers. Even accepting Plaintiff's argument that Plaintiff signed the WTSA, paragraph 10 is completely consistent with the Agreements' notification provision. Read together, the Agreements and WTSA provide that Chase is only potentially liable for errors on wire transfers when (1) a client complies with the 30-day notification provision, and (2) Chase fails to exercise ordinary care.[2] For all of the reasons above, the

---

**2.** Even if, as Plaintiff argues in its Sur-Reply, ECF No. [135], the notification provision at section 38.2 of the OSA conceivably applies to

the Sacks Transfers, that provision merely contains a 60-day notification requirement. Chase mailed Plaintiff's December 2013 Ac-

Agreements' 30-day notification provision governs the Sacks Transfers.

■ Moreover, the Agreements' notification provision does not impermissibly expand or modify Fla. Stat. Ann. § 674.406. Plaintiff seeks to avoid the Agreements' clear terms by arguing that application of the 30-day notification provision to the Sacks Transfers impermissibly modifies and expands Fla. Stat. Ann. § 674.406. *See* ECF No. [125] at 6. In support of its argument, Plaintiff relies heavily on the Eighth Circuit Court of Appeals decision, *Douglas Companies, Inc. v. Commercial Nat. Bank of Texarkana*, 419 F.3d 812 (8th Cir.2005), in which the court analyzed Ark. Code Ann. § 4–4–406, a statute analogous to UCC § 4–406 ("§ 4–406"). In *Douglas*, the Eighth Circuit held that a contract provision imposing "a duty ... to give notice of encoding errors" impermissibly expanded the scope of § 4–406 because § 4–406 deals only "with a customer's duty to discover and timely report unauthorized signatures or alteration[s]." 419 F.3d at 818–19. Plaintiff posits that Fla. Stat. Ann. § 674.406 mirrors UCC § 4–406, and urges the Court to consider decisions in other jurisdictions [such as *Douglas*] which have adopted the model code. ECF No. [125] at 7.

In Florida, Title XXXIX, Chapter 674, Article 4, of the Florida Statutes governs bank deposits and collections. Like UCC § 4–406, Fla. Stat. Ann. § 674.406 covers a "[c]ustomer's duty to discover and report unauthorized signature or alteration." "Absent extraordinary circumstances ... Florida's Uniform Commercial Code and bank-customer agreements place the burden of reviewing statements ... upon the customer." *Cheese & Grill Rest., Inc. v. Wachovia Bank, N.A.*, 970 So.2d 372, 375 (Fla.Dist.Ct.App.2007) (quoting *H. Burdine–Coakley v. Capital Bank*, 542 So.2d 1019 (Fla. 3d DCA 1989)); *see Redland Co. v. Bank of Am. Corp.*, 568 F.3d 1232, 1235 (11th Cir.2009) ("Under Florida law, the customer has an obligation to examine bank statements and notify the bank of any claimed errors or unauthorized activity.") (internal quotations, citation, and formatting omitted); *Lamm v. State St. Bank & Trust Co.*, 889 F.Supp.2d 1321, 1330 n. 9 (S.D.Fla.2012) *aff'd sub nom.* 749 F.3d 938 (11th Cir.2014) ("The customer's failure to provide the bank with timely notice constitutes a complete defense to claims based on the unauthorized items."). Despite having the burden to review and examine its Account Statements under Florida law, Plaintiff's position is that it is excused from notifying Chase of the errors reflected in those Statements because the Agreements' 30-day notification provision impermissibly expands the scope of Fla. Stat. Ann. § 674.406 to include electronic transfers. In support, Plaintiff essentially relies on *Douglas* by way of analogy. Plaintiff, however, has not cited to any authority within the Eleventh Circuit or Florida to support its position, and for good reason.

Florida's UCC places the burden to review bank statements on the customer, and expressly allows the parties to alter the terms of Chapter 674. *See* Fla. Stat. Ann. § 674.103(1); *see also* Fla. Stat. Ann. § 670.501 ("the rights and obligations of a party to a funds transfer may be varied by agreement of the affected party."). In Florida, a Deposit Agreement's "[u]se of the term 'problems or unauthorized transactions' ... rather than 'items' or 'instruments,' as used in chapter 674" does not

---

count Statement on January 9, 2014, and Plaintiff did not notify Chase of any errors until March 11, 2014, sixty-one days later. *See* ECF Nos. [116] ¶¶ 22, 26, 27; [126] ¶¶ 22, 26,

27. Therefore, as elaborated upon in Section D, *infra*, the Agreements' notification provision bars Plaintiff's claims to all Sacks Transfers made prior to January 1, 2014.

violate the Florida Statutes; it "simply provides a broader definition of the types of transactions" covered. *See Bank of Am., N.A. v. Putnal Seed & Grain, Inc.*, 965 So.2d 300, 301 (Fla.Dist.Ct.App.2007). Under Florida law, the Court finds nothing problematic about the Agreements' requirement that Plaintiff notify Chase of any "unauthorized item" or "error," or that an "unauthorized error" may include a deduction effected electronically. Like the contract provision in *Putnal Seed*, the Agreements' 30-day notification provision neither "disclaim[s] the bank's responsibility to exercise ordinary care" nor "limit[s] the bank's damage for its failure to exercise such care," and is therefore presumably valid under Chapter 674. *Id.* But even ignoring this authority and indulging Plaintiff's arguments under *Douglas*, the result is the same.

As urged by Plaintiff, *Douglas* stands for the proposition that a contract cannot expand the scope of UCC § 4–406. Under Florida's analogous provision at Fla. Stat. Ann. § 674.406:

(1) A bank that sends or makes available to a customer a statement of account showing payment of items for the account shall either return or make available to the customer the items paid or provide information in the statement of account sufficient to allow the customer reasonably to identify the items paid. The statement of account provides sufficient information if the item is described by item number, amount, and date of payment.

(3) If a bank sends or makes available a statement of account or items pursuant to subsection (1), the customer must exercise reasonable promptness in examining the statement or the items to determine whether any payment was not authorized because of an alteration of an item or because a purported signature by or on behalf of the customer was not authorized. If, based on the statement or items provided, the customer should reasonably have discovered the unauthorized payment, the customer must promptly notify the bank of the relevant facts.

Fla. Stat. Ann. § 674.406. Per the terms of the statute, § 674.406 applies to an account statement showing the payment of "items." As used in § 674.406, "'item' means an instrument or a promise or order to pay money handled by a bank for collection or payment. The term does not include a payment order governed by chapter 670 . . . ." Fla. Stat. Ann. § 674.104(i). The chapter 670 exemption to "items" includes *all funds transfers* defined in § 670.104,[3] seemingly placing the Sacks Transfers beyond the scope of § 674.406 and *Douglas*. *See* Fla. Stat. Ann. § 670.102 (emphasis added). Chapter 670, however, "does not apply to a funds transfer any part of which is governed by the Electronic Fund Transfer Act ["EFTA"] of 1978." Fla. Stat. Ann. § 670.108. Therefore, if the Sacks Transfers are governed by the EFTA, they are *not* covered by Chapter 670 and may constitute "items" within the meaning of §§ 674.104(i) and 674.406. Critically, however, the Sacks Transfers do not constitute funds transfers governed by the EFTA because the EFTA applies only to "consumers"—defined as "natural person[s]"—and "consumer accounts"—defined as "a demand deposit, savings deposit, or other asset account . . . established primarily for personal, family, or household purposes."

---

**3.** A "'[f]unds transfer' means the series of transactions, beginning with the originator's payment order, made for the purpose of making payment to the beneficiary of the order."

Fla. Stat. Ann. § 670.104(1). For the definition of "payment order" and "beneficiary," see Fla. Stat. Ann. § 670.103.

15 U.S.C. § 1693a(2), (6); *see Iron-forge.com v. Paychex, Inc.*, 747 F.Supp.2d 384, 402 (W.D.N.Y.2010). "Corporations or other business entities are not 'consumers' for purposes of EFTA," and the "EFTA does not apply to accounts that are used primarily or solely for commercial purposes." *Ironforge.com*, 747 F.Supp.2d at 402 (citing *Kashanchi v. Texas Commerce Medical Bank, N.A.*, 703 F.2d 936, 939–42 (5th Cir.1983) ("The EFTA only protects 'consumers,' meaning natural persons, not business entities"). As such, the Sacks Transfers made from Plaintiff's business accounts do not constitute "items" within the meaning of § 674.104(i), and are not covered by § 674.406. Because the Sacks Transfers are exempt from § 674.406, the analysis in *Douglas* pertaining to UCC § 4–406 does not apply.

This conclusion is buttressed by the fact that courts have routinely held that "Article 4 of the UCC does not cover electronic funds transactions" unless the parties expressly agree otherwise. F.D.I.C. Interpretive Letter, 1987 WL 451283, at *1; *see Hospicomm, Inc. v. Fleet Bank, N.A.*, 338 F.Supp.2d 578, 585 (E.D.Pa.2004) ("[N]umerous cases in other jurisdictions have considered the question of whether Article 4 covers electronic fund transfers ("EFTs") ... Each of the cases that have considered the issue have found that the UCC does not apply to EFTs.") *see also Evra Corp. v. Swiss Bank Corp.*, 673 F.2d 951, 955 (7th Cir.1982); *Delbrueck & Co. v. Manufacturers Hanover Trust Co.*, 609 F.2d 1047, 1051 (2d Cir.1979). Under the UCC, the term "'item' does not include transactions effected entirely by electronic means." *Harber v. Leader Fed. Bank for Sav.*, 159 S.W.3d 545, 551 (Tenn.Ct.App.

2004) (citing *Sinclair Oil Corp. v. Sylvan State Bank*, 254 Kan. 836, 869 P.2d 675, 680 (1994) (citing *Bradford Trust Co. v. Tex.–Am. Bank Houston*, 790 F.2d 407, 409 (5th Cir.1986) and other authority)). It is uncontroverted that the Sacks Transfers were effected entirely by electronic means, and thus, the Transfers fall outside the scope of UCC § 4.[4] *See* ECF No. [125] at 3. Accordingly, the *Douglas* Court's reasoning pertaining to encoding errors and UCC § 4 does not apply to the Sacks Transfers. The Agreements' notification provision applies to the Sacks Transfers and does not impermissibly expand Fla. Stat. Ann. § 674.406.

*2. The Agreements' notification provision applies even if Plaintiff never agreed to on-line services*

■ Because the notification provision in the Agreements applies to the Sacks Transfers and does not impermissibly expand the scope of Fla. Stat. Ann. § 674.406, Plaintiff is bound by the Agreements that the Gilberts signed. While Plaintiff contends that the Account Statements did not sufficiently "put Gilbert on notice, especially in light of the fact that Gilbert never agreed to, utilized and/or authorized on-line access," Plaintiff received the Statements each month by mail, and the Statements contained "all of the Sacks Transfers which [Plaintiff] seeks to recover." *See* ECF Nos. [116] ¶¶ 22, 24; [126] ¶¶ 22, 24. The parties agree that the Statements "showed all of the transfers to S Qwerty and/or Steven Sacks." ECF Nos. [116] ¶ 22; [126] ¶ 22. Plaintiff had 30 days to notify Chase of any errors, a notification period that this Court finds valid in light of persuasive authority. *See Graves v. Wacho-*

---

4. To the extent that UCC § 4A applies to wire transfers, the Court finds the Agreements' 30-day notification clause permissible. *See* Fla. Stat. Ann. § 670.501 ("the rights and obligations of a party to a funds transfer may be varied by agreement of the affected party."); *see also Priority Staffing, Inc. v. Regions Bank*, 2013 WL 5462239, at *3 (W.D.La. Sept. 30, 2013).

*via Bank, N.A.*, 607 F.Supp.2d 1277, 1281 (M.D.Ala.2009) ("Because plaintiff has not presented any evidence that a customer ... contacted Wachovia within the 40-day period established in the contract, there is no genuine question of material fact on her breach-of-contract claim."); *Putnal Seed & Grain, Inc.*, 965 So.2d at 301 (Approving 60-day notice condition precedent); *see also Cheese & Grill Rest., Inc.*, 970 So.2d at 375 (Upholding 30-day notice provision). Chase provided Plaintiff with monthly statements documenting all deductions from its Accounts; the Court rejects Plaintiff's contention that it somehow lacked notice of these deductions simply because the Gilberts never authorized their form. While unfortunate, Plaintiff missed its opportunity to recuperate the majority of the Sacks Transfers.

### C. Material Breach

In the alternative, Plaintiff argues that it did not need to comply with the 30-day notification provision because Chase committed a material breach. Plaintiff claims that Chase generally breached the Agreements by (1) allowing Sacks to open an S Qwerty account; (2) permitting Sacks access to wire funds out of the Accounts through Chase's banking system despite Plaintiff's notifying Washington Mutual, Chase's predecessor, that Sacks did not have access to the Accounts; and 3) allowing "someone" to change the notification email address from Randall Gilbert's to Sacks's address. *See* ECF No. [125] at 11, 13; *see also* ECF No. [49] ¶ 58. Plaintiff does not, however, actually claim in its Amended Complaint, Response, or Sur-Reply that Chase materially breached a specific provision, clause, or paragraph of the 2009 or 2012 Agreement.

Plaintiff's failure to point to a specific provision in the Agreements is important because determining whether a party breached a contract requires a court

to resolve "[w]hich terms are 'essential,'" and "varies according to the nature of the contract." *Kelly v. Metro. Life Ins. Co.*, 2013 WL 5797367, at *2 (S.D.Fla. Oct. 28, 2013) (citing *Socarras v. Claughton Hotels, Inc.*, 374 So.2d 1057, 1060 (Fla. 3d DCA 1979)). A material breach to excuse performance only occurs when a party breaches "mutually dependent covenant[s]" in a contract, and does not occur when a contract is "composed of independent covenants." *Mizner Land Corp. v. Abbott*, 128 Fla. 489, 504, 175 So. 507 (1937). A dependent covenant "is one that depends on the prior performance of some act or condition." *Seybold v. Nicholson USA Properties, LTD.*, 890 So.2d 351, 353 (Fla.Dist.Ct. App.2004). An independent covenant, on the other hand, concerns only "a part of the consideration on both sides," and allows for damages rather than nonperformance as a remedy. *Nolan v. Lunsford*, 142 Fla. 671, 680, 196 So. 193 (1940). Plaintiff has failed to cite to a specific covenant of the 2009 and/or 2012 Agreements Chase allegedly breached that would relieve Plaintiff of its obligations under the 30-day notification provision. Accordingly, Plaintiff has failed to establish that Chase breached a mutually-dependent covenant of the Agreements.

In its Amended Complaint, Plaintiff does claim that Chase breached paragraph 2 of the Washington Mutual agreement ("WaMu Agreement"), executed in January of 2009. *See* ECF No. [49], Exh. A (Washington Mutual Master Account Agreement). In paragraph 2, the parties agreed that "[w]ithdrawals or transfer transactions may be paid by Bank on the authorization of one account owner or signer." *Id.*; *see* ECF No. [49] ¶ 54. Plaintiff claims that Sacks was never an account owner or signer, and that Chase breached the WaMu Agreement by allowing Sacks to establish online access to the Accounts and transfer funds from the Accounts

without the authorization of the Gilberts. *See* ECF No. [49] ¶¶ 58-59. Plaintiff also states that it notified Washington Mutual in writing that Sacks was prohibited from having any access to the Accounts. *See* ECF No. [125] at 11; *see also* ECF No. [126-8] ¶ (4)(m) (Affidavit of Randall Gilbert). However, the 2009 Agreement, issued after the WaMu Agreement, provides that the terms contained therein "will govern your checking and savings accounts beginning July 24, 2009." ECF No. [116-2] at 187. The 2009 Agreement is a valid agreement, and does not incorporate the terms of the WaMu Agreement or the notification letter allegedly sent to Washington Mutual. Therefore, neither the WaMu Agreement nor the Sacks letter absolve Plaintiff of its obligations under the 2009 Agreement. *See De Leon v. Bank of Am., N.A. (USA)*, 2009 WL 3822392, at *3 (M.D.Fla. Nov. 16, 2009) ("As neither the Agreement nor the Statement itself state that the Statement is 'part of the Agreement,' the Court finds that the Statement is not a part of the parties' contractual relationship.") (alteration omitted).

Although Plaintiff has failed to establish that Chase breached a mutually dependent covenant, the Court notes, for completeness sake, that the 30-day notification clause appears independent of the Agreements' other provisions and paragraph 2 of the WaMu Agreement. The Agreements clearly contemplate money damages in the event that Chase becomes liable to Plaintiff, and include the 30-day notification condition on Chase's obligation pay. *See Nolan*, 142 Fla. at 680, 196 So. 193. The fact that the 30-day notification provision

exists at all shows that the parties recognized that "unauthorized errors" may occur, but that Chase would have a qualified obligation to pay damages if they did. Like many courts that have addressed the preclusive effect of banking notification clauses, the Court finds that the Agreements' notification provision applies whether or not Chase breached the Agreements as alleged.[5] *See Graves*, 607 F.Supp.2d at 1281; *Priority Staffing, Inc.*, 2013 WL 5462239, at *3; *see also Putnal Seed & Grain, Inc.*, 965 So.2d at 301; *Cheese & Grill Rest., Inc.*, 970 So.2d at 375. The 30-day notification provision is valid, and Plaintiff at all times had an obligation to notify Chase of any unauthorized errors in its Statements.

**D. Chase's Liability For The Sacks Transfers Made After December 31, 2013 And Non-Compensatory Damages**

█ The Trust Account Statement for the period November 30, 2013 through December 31, 2013, in tandem with the prior Account Statements mailed to Plaintiff, reflected all of the Sacks Transfers and account deductions made prior to January 1, 2014. *See* ECF Nos. [116] ¶¶ 22, 24; [126] ¶¶ 22, 24. Chase mailed Plaintiff's December 2013 Account Statement on January 9, 2014, and Plaintiff did not notify Chase of any errors until March 11, 2014, sixty-one days later. *See* ECF Nos. [116] ¶¶ 22, 26, 27; [126] ¶¶ 22, 26, 27. Therefore, Plaintiff cannot recover any damages related to the Sacks Transfers made prior to January 1, 2014. Plaintiff may still recover compensatory damages for all Sacks Transfers made

---

**5.** Additionally, Plaintiff's assertion in its Response that Chase acted in an unauthorized and negligent manner by allowing Sacks access to the Accounts fails to allege a material breach. *See Florida Digital Network, Inc. v. N. Telecom, Inc.*, 2007 WL 604983, at *3 (M.D.Fla. Feb. 22, 2007) ("The commission of a tort is not a "material breach of [an] Agreement."); *see also In re Tsiaoushis*, 383 B.R. 616, 619 (Bankr.E.D.Va.2007), *aff'd*, 2007 WL 2156162 (E.D.Va. July 19, 2007) ("[F]ailure to perform a remote and speculative fiduciary duty, if one exists, is not a 'material breach excusing the performance of the other.' ").

on or after that date.[6] *See* ECF No. [115] at 2, 7-9. Accordingly Plaintiff's claims for compensatory damages incurred after December 31, 2013, survive.

 Plaintiff's claims for all other damages, however, do not. Chase argues that the Agreements bar Plaintiff's claims for consequential and incidental damages. *See* ECF No. [115] at 10. Plaintiff does not challenge Chase's argument, and the Court finds the Agreements' plain language dispositive. In both the 2009 and 2012 Agreements, Plaintiff agreed that Chase "shall not be liable for indirect, special or consequential damages regardless of the form of action and even if we have been advised of the possibility of such damages." ECF No. [116-2] at 213, 261. "Florida courts allow parties to limit remedies contractually, and if such provisions are made, a court may not award greater compensatory damages." *Amoco Oil Co. v. Gomez*, 125 F.Supp.2d 492, 511 (S.D.Fla.2000) (citing *Lafayette Stabilizer Repair, Inc. v. Machinery Wholesalers Corp.*, 750 F.2d 1290, 1294 (5th Cir.1985)); *see CC–Aventura, Inc. v. The Weitz Co., LLC*, No. 06–21598–CIV, 2009 WL 3326806, at *3 (S.D.Fla. Oct. 9, 2009) ("[P]arties may agree to limit their damages, and courts will generally enforce limitation-of-liability provisions.") (citing Fla. Stat. 672.719(1)(a), (3)). Damages for lost profits, loss of reputation, and loss of goodwill all constitute consequential damages. *See Nyquist v. Randall*, 819 F.2d 1014, 1017 (11th Cir.1987) ("[L]ost profits may indeed be the quintessential example of 'consequential damages.' "); *Swamy v. Caduceus Self Ins. Fund, Inc.*, 648 So.2d 758, 760–61 (Fla. 1st DCA 1995) (finding that damage to a plaintiff's professional reputation and losses "resulting from the attendant negative publicity" are "at best, an indirect consequence of [the defendant's] failure to settle"); *Bevins v. Partridge, Jones & Assocs., Ltd.*, 22 Va.

Cir. 334 (1990) ("[T]he court concludes that damages for loss of professional reputation would fall, at best, in the category of consequential damages."); *U.S. v. Petty Motor Co.*, 327 U.S. 372, 378, 66 S.Ct. 596, 90 L.Ed. 729 (1946) ("[D]amage to good will ... and other such consequential losses are refused in federal condemnation proceedings."). Florida courts have upheld damage limitation provisions similar to those contained in the Agreements. *See Amoco Oil Co.*, 125 F.Supp.2d at 511; *Hi Neighbor Enter., Inc. v. Burroughs Corp.*, 492 F.Supp. 823, 827 (N.D.Fla.1980); *see also Silverpop Sys., Inc. v. Leading Mkt. Techs., Inc.*, 641 Fed.Appx. 849, 857 (11th Cir.2016); *Cooper v. Meridian Yachts, Ltd.*, 575 F.3d 1151, 1157 (11th Cir.2009). Accordingly, the Agreements' contractually agreed-upon limitation provision bars Plaintiff's claims for incidental and consequential damages, including any claims emanating from damage to Plaintiff's goodwill and reputation. *See* ECF No. [49] ¶¶ 50, 61.

### E. The Motion's Maturity And Plaintiff's Motion To Amend Complaint

 Finally, Plaintiff argues that the Court should deny the Motion because material facts still exist, and the Motion is premature. The Court rejects Plaintiff's argument because the majority of material issues of fact alleged by Plaintiff are not germane to the dispositive issues in this case. *See* ECF No. [125] at 16; *see also* Fed. R. Civ. P. 56(a); *Miccosukee Tribe of Indians of Fla.*, 516 F.3d at 1243. The Court specifically rejects Plaintiff's contention that a material dispute remains regarding the adequacy of notice provided in the Account Statements for the reasons stated herein. As to the Motion's prematurity, any information that Plaintiff hopes to glean from its intended depositions will

---

**6.** Chase states that this sum amounts to $416,000. *See* ECF No. [115] at 2, 7 n.6.

not change the plain language of the Agreements. The Court notes that since Plaintiff filed its Response, it has taken the deposition of Sacks and Nicholas Sergi, and the Court has considered Plaintiff's Sur-Reply and attached deposition transcripts. *See* ECF Nos. [135], [136], [137].

The Court also denies Plaintiff's Motion for Leave to File Second Amended Complaint, ECF No. [124]. The Court originally set an August 24, 2015 deadline for Plaintiff to file an a amended complaint. *See* ECF No. [27]. The Court extended that deadline, and Plaintiff filed an Amended Complaint on August 31, 2015. *See* ECF No. [49]. The Court does not find good cause to now extend the filing deadline again, over nine months past the original deadline, less than one month before the discovery completion deadline, and subsequent to Chase filing its Motion for Summary Judgment. *See* Fed. R. Civ. P 16(b); *S. Grouts & Mortars, Inc. v. 3M Co.*, 575 F.3d 1235, 1241–43 (11th Cir.2009). Although amendment may be proper in certain circumstances at such a late stage of proceedings, Plaintiff now seeks to add only claims for further damages. *See* ECF No. [124] ¶ 26. To the extent that Plaintiff seeks to add claims for compensatory damages incurred prior to January 1, 2014 or non-compensatory damages incurred at any time, amendment is futile because Plaintiff's claims are foreclosed by the Agreements. *See Hall v. United Ins. Co. of Am.*, 367 F.3d 1255, 1263 (11th Cir.2004) ("[D]enial of leave to amend is justified by futility when the complaint as amended is still subject to dismissal."). Accordingly, the Court denies Plaintiff's motion.

## IV. CONCLUSION

Plaintiff may bring claims for compensatory damages suffered after December 31, 2013, and nothing more. It is therefore **ORDERED AND ADJUDGED** that Defendant's Motion for Summary Judgment, ECF No. [115], is **GRANTED** in part and **DENIED** in part as follows:

1. Summary judgment is **GRANTED in favor of Defendant** as to all Counts related to the Sacks Transfers made prior to January 1, 2014;

2. Summary judgment is **DENIED** to the extent that Plaintiff seeks compensatory damages related to the Sacks Transfers made on or after January 1, 2014;

3. In addition, Plaintiff's Motion for Leave to File Second Amended Complaint, **ECF No. [124]**, is **DENIED**.

**DONE AND ORDERED** in Miami, Florida this 15th day of June, 2016.